

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00413-CV

———————————————

DAVID RICE, Appellant

V.

MELINDA RICE, Appellee

---

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-643350-18

---

Before Bassel, Womack, and Walker, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

In four issues, Appellant David Rice (Husband) challenges the corrected final decree entered in the divorce proceeding between himself and Appellee Melinda Rice (Wife). The issues break down into challenges to various pretrial and post-trial procedural matters, a host of attacks on the trial court's exercise of its discretion in dividing the estate of the parties, and an attack on an attorney's fee award. As to each of the issues and subissues that are raised, the following summarizes our specific holdings:

- We overrule Husband's first issue because the trial court did not abuse its discretion by denying his motion for continuance predicated on a claimed need for additional discovery.

- We overrule Husband's second issue because the trial court's division of the community estate was not manifestly unjust. Specifically:

  - the trial court did not err in the treatment of Husband's potential personal-injury recovery because it was an expectancy;

  - assuming without deciding that the trial court abused its discretion by awarding Husband an account that Wife had "drained," that error did not skew the division of the estate to the point that it became manifestly unjust;

- o the trial court did not err in its valuation of Husband's interest in an investment firm that he partially owns;

- o the trial court did not err by failing to value and consider Husband's medical debt and potential tax liability;

- o the trial court did not commit harmful error by refusing to permit questions of Wife's former counsel about attorney–client communications; and

- o the trial court was within its power to make credibility determinations when it decided that Husband had a greater earning potential than Wife.

- o Because we overrule most of Husband's claims of error, and, assuming error, determine that any error is harmless, we also overrule his claim that the cumulative effect of those alleged errors makes the division manifestly unjust.

- The trial court did not abuse its discretion by denying Husband's motion for new trial grounded on a claim of newly discovered evidence.

- The trial court erred by awarding Wife appellate attorney's fees because there was insufficient evidence to support that award.

Thus, we affirm the trial court's corrected final decree of divorce except for the award of appellate attorney's fees to Wife, we reverse the trial court's corrected final

decree of divorce as to the award of appellate attorney's fees to Wife, and we remand for a new trial solely on that issue.

## II. Background

Husband and Wife separated after seventeen years of marriage. No children were born of the marriage; thus, the issues before the trial court centered on the division of the parties' approximately $750,000 estate of the parties.

Husband and Wife argued for dispositions of the estate favorable to themselves based on various factors—many of which were based on alleged misconduct by the other. At this point, we will summarize only the broad issues that the trial court had to reconcile in dividing the estate of the parties and reserve a more detailed discussion to the analysis section below.

Though we do not necessarily agree with Wife's characterizations, her brief summarizes the primary factors that she argues support the disposition of the estate in her favor as follows:

- Husband's higher earning potential;
- Husband's incurring attorney's fees unnecessarily in his attempts to prove that Wife had "stole[n]" money from the community, and such expenditures far exceeded any benefit to the community;
- Husband's significantly higher (six times higher than Wife's) cash withdrawals from the community estate during the divorce;

4

- Husband's expenditure in this case of incurring over $140,000 in attorney's fees, a "significant portion" of which were wasted trying to obtain erased text messages in an attempt to prove what he could have proven with documentation that he already had access to;

- Husband's troublesome dealings with the community estate "far exceed[ing]" those of Wife;

- Husband's expenditure of a large sum of cash—over $37,000—on medical treatments that he had found through Groupon and that are likely not reimbursable in his Uber lawsuit due to his actions;

- Husband's behavior that could result in Wife's teaching contract not being renewed; and

- Husband's actions that increased Wife's attorney's fees.

Many of the issues raised by Husband at trial—and now on appeal—sought to undercut the potency of the factors that Wife and the trial court relied on for an unequal division of the estate in Wife's favor and to argue that the trial court failed to give appropriate weight to Wife's alleged misdeeds:

- Husband emphasized that he had been injured in a motor-vehicle accident involving Uber. He contended that the injuries from that accident had left him disabled and would cause him to lose the income that he had been receiving from his investment firm once the divorce was over. Once the

5

divorce was over, he claimed that he would have to live on Social Security Disability Income payments.

- Somewhat associated with the prior issue, Husband challenged Wife's expert's valuation of his interest in the investment firm.

- He contended that Wife had compulsively hoarded cash, with that behavior manifesting itself through a years-long habit of purchasing small items at stores or purchasing gift cards and receiving cash back as part of the transaction. He further contended that this type of behavior had also allegedly manifested itself in misconduct by Wife in her job as a teacher and that the school district that Wife worked for was investigating her for misappropriating school funds.

- Husband also vigorously pursued allegations that Wife had used a friend to act as a straw purchaser of a house, which was purchased shortly after the filing of the suit for divorce and which Wife had claimed that she rented. The controversy involving the house spawned a number of other issues that Husband argued should have impacted the trial court's view of Wife's credibility and the division of the estate. Husband contended that Wife had fabricated a lease for the house. Other issues that spun off from the house issue included (1) whether Wife had been forthcoming in discovery, (2) whether the trial court should have delayed the trial to permit additional

discovery on the issue, (3) whether Wife had perjured herself, and (4) whether the trial court's conclusion that Wife had wasted $90,000 of community assets by her actions with respect to the house was a proper disposition of the issue.

After hearing the evidence, the trial court ultimately divided the estate of the parties unequally in favor of Wife.

Though the clerk's record is voluminous, most of that volume resulted from the inclusion of various discovery documents and pleadings not referenced by the parties in their briefs. The salient procedural steps in this matter are as follows: (1) the case was tried to the court; (2) before the trial commenced, Husband sought and was denied a continuance to obtain additional discovery of primarily text messages related to the alleged straw purchase of the house that Wife claimed that she had rented; (3) the trial court signed a decree (and later a corrected final decree) specifying how it had divided the estate of the parties and then issued findings of fact and conclusions of law; and (4) Husband filed a motion for new trial—which was denied by the trial court—based on a claim that after trial, Husband had obtained documents from Wife's employer showing her dishonesty and her concealment of materials that should have been produced in discovery and augmenting his claims that she had been stealing and secreting community assets. This appeal followed.

7

## III. Analysis

### A. The trial court did not abuse its discretion by denying Husband's motion for continuance.

In his first issue, Husband contends that the trial court erred by denying a continuance (that was raised in a motion to compel) in order to seek additional discovery. The trial court did not abuse its discretion by denying the motion for a host of reasons, including that there was testimony that the documents sought did not exist, that Husband's counsel had failed to pursue available avenues to obtain the documents, and that Husband's argument ignores how the trial court had given him an opportunity to determine if the documents existed and his failure to challenge that opportunity as ineffectual.

#### 1. We set forth the status of the case when Husband sought the continuance, the record on the need for the continuance, and how the trial court attempted to accommodate Husband's continuance request.

The original petition in this matter was filed in June 2018. The continuance at issue sought to delay a trial that had been set almost three years after the filing of the case. This continuance was sought after at least three prior continuances had already been granted.

Husband filed a motion to compel about three weeks before the case went to trial, and in that motion, he claimed that he needed a continuance. The ground for the motion was the alleged inability to obtain documents from Wife in response to Husband's requests for production. In the motion, Husband claimed that Wife's

responses to his requests for production were inadequate because they failed to include the following:

>    1.  Phone Records - We have requested detailed phone records [that include Wife's] text messages sent and received.
>
>    2.  Full records from . . . Groupon, Amazon, Kohl's[,] and Dick's Sporting Goods accounts - we have previously requested full compliance and have provided detailed instructions on how to accomplish this request.
>
>    3.  Lowe's charge account statements - such statements are responsive to Request 21 on [Husband's] Request for Production and Inspection and have not been produced.

The motion asserted that Wife's counsel had failed to cooperate in the entry of an order compelling production and focused on the fact that Wife "ha[d] provided 526 pages of text messages between herself and [Husband] but ha[d] refused to produce any text messages between herself and others, which she clearly ha[d] access to, because they would show the fraud and perjury she has committed against [Husband] and this [c]ourt." As part of the relief sought, Husband requested that "[t]his case should be continued until such time as the required or ordered records be produced."

The trial court conducted a hearing on the motion. The focus of the motion was the text messages that Wife had allegedly not produced. Husband's counsel explained that the text messages related to a claim that Wife had engaged in a straw-man transaction for the purchase of a house—a transaction that served as one of the primary controversies in the division of the estate of the parties:

9

The first one is phone records. . . . [W]e have been seeking text messages that [Wife] has had between herself and a real estate agent and herself and her best friend, [the alleged straw purchaser]. We've been seeking these for over a year.

There's been a claim [that] she didn't have access to these text messages. But in January, she provided us with 526 pages of text messages between herself and [Husband], which she allegedly believes is an official -- but she has consistently refused to provide us with these text messages of other important witnesses.

And we believe that she has the phone, she has the ability to load that program just like she did to provide us the other messages and provide that to us.

The reason why this is important is that we have provided -- the [c]ourt may remember -- we had to get letters of interrogatory because we were taking the deposition of a witness in Kansas City, who's her best friend.

We believe that the house that she is in is actually -- that she's allegedly renting from her best friend in Kansas City who allegedly bought this house in Texas[;] we believe it's a straw transaction. We believe that the substantial monies that were put down on this house and [that] the alleged rent that she is paying, is actually -- we believe it's her own property.

We believe that the testimony all taken together will reflect that, but it will be proven specifically by these text messages because I've taken the deposition of [Wife], I've taken the deposition of [the alleged straw purchaser], and I've taken the deposition of the real estate [agent]. And we know there's been significant communications between them related to this, and we believe the text messages will show that there's actually been a fraud committed on this [c]ourt. And by her testimony and their testimony[,] it's significant . . . .

Wife testified during the hearing about why she did not have copies of the sought-after texts and her prior production of the texts between her and Husband. At the time of the purchase of the house that Husband claimed was a straw purchase,

10

Wife had been "on [her] friend's [phone] line." Wife had provided Husband's counsel with "a release to get anything from [her] friend that he needs." Wife claimed that she had deleted all the texts from this phone, except for the ones that she had exchanged with Husband. The cell phone that she had used during the relevant period was returned to the cell-service provider. The cell-service provider had produced several hundred pages of documents showing the phone numbers between which texts had been exchanged but did not have any details of the messages themselves. The 500-plus pages of actual texts that were produced were text messages between herself and Husband that Wife had screenshotted and saved.

After hearing this testimony, the trial court asked Husband's counsel how he expected Wife to produce documents that she did not have, what he had done to obtain the documents after being given the release to obtain them, and how the technology would permit him to obtain the documents that he sought. Counsel responded that he assumed the documents were available from the phone and had not pursued other avenues to obtain the documents:

> THE COURT: Okay. [Husband's counsel], I can't make her give something she doesn't have. How long have you had that release, [Husband's counsel]?
>
> [Husband's counsel]: Just a couple of months, I believe.
>
> THE COURT: Okay. And during the couple months, have you taken the opportunity to get everything you can from that friend? Have you checked the cloud? Have you done all those things?

11

[Husband's counsel]:  I'm not an expert at all, Judge, in this regard.  It was our belief she had the phone, and she could provide that information to us and that's what we've been trying to do.

In addition --

THE COURT:  Okay.  And I'm sorry that you don't understand how text messages work, but when you have the phone, the phone itself doesn't give you that information.  So I don't know what else to tell you.

After additional discussion, the trial court again asked and counsel confirmed that he had received a release to obtain the phone records from the cell-service provider.  Husband's counsel again raised Wife's dilatory discovery tactics and noted delays in obtaining the deposition of the alleged straw purchaser.  Husband's counsel claimed that he had "attempted to do as much as [he] could as reasonably as [he] could, been trying to save as much money as [he] could by doing this."  The trial court then clarified that Husband had taken the deposition of the alleged straw purchaser, but Husband contended that the alleged straw purchaser had perjured himself.  The trial court then asked why Husband had delayed in filing his motion to compel, and another discussion ensued regarding that Wife had not produced all the records that she had in her possession when previously ordered to do so.

The trial court then noted that it did not know how to help Husband's counsel because he had not pursued the discovery from the available sources:

THE COURT:  [N]ow, if the messages aren't there, they're not there.  I don't know what to tell you, [Husband's counsel].  What you have are from Sprint and what she's screenshotted on her phone.  You can't get those records if they're deleted from the phone unless they're in an iPhone Cloud on the phone[,] but that would have to be the cloud that

12

was owned by whoever owned it. And I'm sorry you don't know enough about that to ask for it, but I'm not going to continue this trial.

Counsel did not respond to the court's statement other than to offer the testimony of his client. Husband testified that Wife had a program called "Decipher" on her computer to extract text messages. Wife acknowledged that she had such a program but stated that the program would not pull texts that had been deleted. The trial court ordered Wife to immediately produce the computer with the Decipher program so that it could be examined by an expert for Husband. If the examination produced additional evidence, the trial court stated that it would consider a continuance for a few weeks. Husband's counsel claimed that it was impossible to have the examination done quickly, but the trial court disagreed.

With respect to the documents from the various vendors that the motion to compel referenced, Husband's counsel briefly described them but also stated that the most important issue was the text messages. After the discussion that we have detailed above about the text messages, the trial court asked Husband's counsel whether there was "[a]nything other than the phone messages" that he wanted to discuss, and he replied, "That's it for us."

The trial began as scheduled. Husband sought a continuance at the beginning of the trial but made no reference to the documents discussed at the motion-to-compel hearing, his inability to obtain an expert to inspect Wife's computer, or (assuming an expert had inspected Wife's computer) the documents that were

uncovered by such an inspection. Husband limited his request for a continuance on the following grounds:

> As we placed in our notice to the [c]ourt, we are not ready to proceed. We still have not been able to go to mediation in this case. The main reason is because of the fact that it took so long on the discovery that we have not had an opportunity to accomplish that. We think that mediation would be a better source of resolving this case rather than litigating it.
>
> In addition to that, . . . [Wife's counsel] just gave me his exhibit list, and he includes in that a third amended inventory and appraisement of [Wife], which I've seen now for the first time today, which was signed, looks like at least a week ago, and so I haven't had an opportunity to review that.
>
> But we would request that the [c]ourt continue the case and allow us to go to mediation and help get it resolved.

No mention of the continuance to obtain the texts was made again until hearings on post-trial motions, and then there was no mention of any effort that Husband had made to inspect Wife's computer.

### 2. We set forth the standards governing a continuance request based on the need for additional discovery.

The Fourteenth Court of Appeals recently provided a succinct summary of the standard of review and elements of proof that govern a motion for continuance predicated on the need for additional discovery:

> We review the denial of a motion for continuance under the abuse-of-discretion standard. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004). In determining whether the trial court abused its discretion in denying a request for a continuance to conduct further discovery, courts consider the following nonexclusive factors: (1) the length of time the case has been on file, (2) the materiality of the

14

discovery sought, and (3) the movant's diligence in obtaining the discovery. *Tri-Stem, Ltd. v. City of Houston*, 566 S.W.3d 789, 799 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).

*Matter of Marriage of Moncur*, 640 S.W.3d 309, 321 (Tex. App.—Houston [14th Dist.] 2022, no pet.).

### 3. We conclude that the trial court did not abuse its discretion by denying Husband's motion for continuance.

Husband marshals the following arguments to support his claim that the trial court abused its discretion by denying his motion for continuance, but as we explain, none of these arguments are persuasive:

- Husband first argues that the discovery sought was material because it impacted the division of the estate of the parties. With respect to the documents from the vendors, Husband did not press this argument at the continuance hearing and described them as of secondary importance and did not press the need for their production when asked if there were any other matters to be discussed. With respect to the text messages, Husband simply ignores Wife's testimony that the records he sought did not exist because she had deleted the body of the texts. Thus, Husband ignores the question of why the case should have been continued if the documents did not exist. Nor does he contend that the remedy that the trial court fashioned was inadequate. The trial court ordered the production of Wife's computer to be examined by an expert employed by Husband to determine

15

whether the text messages existed. When the case came to trial, no mention was made of any inability of Husband to have the computer examined or—assuming an expert had inspected Wife's computer—of any documents that were obtained from the examination. This, again, leaves Husband in the position of claiming documents were material without proof that they even existed.

- Next, Husband argues that delays in the trial setting could not be attributed to him because discovery was delayed by Wife's obstructive tactics and by the alleged straw purchaser of the house. This argument begs the question in two ways. First, it ignores the question regarding whether the text messages that Husband sought from Wife were in her possession and why further delay was warranted when Husband could offer no proof that the documents he sought existed. Second, Husband turns a blind eye to his counsel's silence in response to the trial court's inquiry on why he did not pursue the documents from the cell-service provider. In other words, there is no explanation why the trial should have been further delayed because Husband had an avenue to obtain the discovery and because his counsel offered no reason why that avenue was not pursued.

- Further, Husband argues that he acted with diligence to obtain the records. There are two flaws in this argument. The claim of diligence is rebutted by

16

the fact that counsel could offer no explanation for why he did not pursue the document from the cell-service provider even though he had received a release "a couple of months" prior to the hearing to obtain whatever documents existed. Nor did he explain why he did not pursue examination of Wife's computer to determine what the Decipher program held until the eve of trial.

- Finally, in his reply brief, Husband argues that the continuance should have been granted because certain "school records" were not produced. No school records were mentioned in Husband's motion to compel or at the continuance request at trial. Those documents were mentioned in a post-trial hearing. Husband does not explain how the trial court abused its discretion by denying a continuance based on grounds not presented to it at the time of these hearings.

At bottom, the trial court did not abuse its discretion by denying Husband a continuance to obtain documents when (1) Wife testified that the primary documents that Husband wanted no longer existed, and his lawyer offered no reason why the failure to obtain the other documents referenced in the motion to compel were vital to Husband's case; (2) Husband's counsel offered no explanation for why he did not pursue the documents from the cell-service provider even though he had the means to do so; and (3) there is no explanation for why the remedy fashioned by the trial court to permit examination of Wife's computer was inadequate, especially when no

17

suggestion was later made that Husband had lacked the time or ability to conduct the examination or that the examination had not born fruit.

Accordingly, we overrule Husband's first issue.

**B.     The trial court made a "just and right" division of the estate of the parties.**

   **1.     We set forth (1) the principles that govern the "just and right" division of the estate of the parties, (2) the standard of review to test the trial court's exercise of its discretion in dividing the estate, and (3) what level of error must be present in the division to warrant a reversal.**

      **a.     We set forth the authority obligating the trial court to make a "just and right" division of the estate of the parties and the factors to be considered in making that division.**

The Family Code mandates that "[i]n a decree of divorce or annulment, the [trial] court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party." Tex. Fam. Code Ann. § 7.001. To carry out the mandate of Section 7.001, the division need not be equal, but it must be equitable. *Halleman v. Halleman*, 379 S.W.3d 443, 452 (Tex. App.—Fort Worth 2012, no pet.). "Although the court need not divide the community estate equally, a disproportionate division must be supported by some reasonable basis." *Smith v. Smith*, 143 S.W.3d 206, 214 (Tex. App.—Waco 2004, no pet.).

This court has previously cataloged the factors that a trial court may consider in making its division:

> Nonexclusive factors that the trial court may consider include "the spouses' capacities and abilities, benefits [that] the party not at fault would have derived from continuation of the marriage, business opportunities, education, relative physical conditions, relative financial condition and obligations, disparity of ages, size of separate estates, and the nature of the property." *Murff v. Murff*, 615 S.W.2d 696, 699 (Tex. 1981). The trial court may also consider one spouse's dissipating, misusing, and defrauding the community estate. *Schlueter v. Schlueter*, 975 S.W.2d 584, 589–90 (Tex. 1998); *Vannerson v. Vannerson*, 857 S.W.2d 659, 669 (Tex. App.—Houston [1st Dist.] 1993, writ denied). Finally, the trial court may consider fault in the breakup of the marriage, but the trial court should not use fault to punish the guilty party when dividing the community estate. *Bradshaw v. Bradshaw*, 555 S.W.3d 539, 543 (Tex. 2018) (citing *Young*[ *v. Young*], 609 S.W.2d [758,] 761–62 [(Tex. 1980)]). No single factor controls. *Felix-Forbes v. Forbes*, No. 02-15-00121-CV, 2016 WL 3021829, at *2 (Tex. App.—Fort Worth May 26, 2016, no pet.) (mem. op.); *see, e.g.*, *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex. 1987), *overruled on other grounds by Price v. Price*, 732 S.W.2d 316, 319–20 (Tex. 1987).

*Hamilton v. Hamilton*, No. 02-19-00211-CV, 2020 WL 6498528, at *5 (Tex. App.—Fort Worth Nov. 5, 2020, no pet.) (mem. op.).

### b. We set forth the standard of review that we apply to test the propriety of the trial court's division of the estate of the parties.

Though the overall standard of review in making a "just and right" division is an abuse of discretion, the application of that standard requires a layered analysis that tests both the level of information that the trial court had to act on and then how it implemented its decision using that information. *See Logsdon v. Logsdon*, No. 02-14-

19

00045-CV, 2015 WL 7690034, at *3 (Tex. App.—Fort Worth Nov. 25, 2015, no pet.)

(mem. op.). Again, a prior opinion from this court succinctly describes the approach:

> In family-law cases, the traditional sufficiency standards of review overlap with the abuse-of-discretion standard of review; therefore, legal and factual insufficiency are not independent grounds of error but are relevant factors in our assessment of whether the trial court abused its discretion. *Neyland v. Raymond*, 324 S.W.3d 646, 649 (Tex. App.—Fort Worth 2010, no pet.). To determine whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we must determine (1) whether the trial court had sufficient evidence upon which to exercise its discretion and (2) whether the trial court erred in its application of that discretion. *Id.* The applicable sufficiency review comes into play with regard to the first question. *Id.*

> The sufficiency standards of review we apply are the same for a trial court's findings of fact as for a jury's answers to questions in the court's charge; the findings are reviewable for legal and factual sufficiency of the evidence to support them. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009). Evidence is legally insufficient to support a trial court's finding of fact only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) [(op. on reh'g)] . . . . In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming

20

weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

*Id.*[1]

### c. A trial court's errors in valuing the estate of the parties do not constitute an abuse of discretion unless they render the division of the estate manifestly unjust.

Simply because the trial court makes an error in valuing the estate of the parties, that error does not produce an automatic remand for a new trial because

[v]aluation errors, standing alone, do not constitute an abuse of discretion. *Thomas v. Thomas*, 603 S.W.2d 356, 358 (Tex. . . . App.— Houston [14th Dist.] 1980, writ dism'd . . . ) (op. on remittitur). Like errors affecting the just and right division, errors in valuation of property do not require reversal unless the valuation errors render the trial court's division manifestly unjust. *Von Hohn*[ *v. Von Hohn*], 260 S.W.3d [631,]

---

[1]Husband contends that the trial court erred by failing to make findings about the values and amounts of various assets and liabilities. Wife responds,

On a related note, Husband incorrectly asserts in his brief that the trial court erroneously failed to make findings of value related to certain credit[-]card accounts[;] debts incurred after June 1, 2018[;] and the amount of Husband's attorney's fees the court characterized as waste. He has failed to support his argument with references to the record showing that the amounts were disputed. The amounts and values were not disputed, so findings were not required. Regarding the amount of attorney's fees he wasted, Husband has failed to show that the trial court was required to make a finding of that value. [Brief references omitted.]

Husband never tells us how the failure to make the findings that he claims should have been made has negatively impacted his ability to present his appeal, and it does not appear that it has. *See Isaac v. Burnside*, 616 S.W.3d 609, 614–15 (Tex. App.— Houston [14th Dist.] 2020, pet. denied) ("We conclude that the trial court's failure to issue findings of fact and conclusions of law did not leave [appellant] to guess the basis for the trial court's rulings and did not prevent him from making a proper presentation of his case to this court.").

21

641[ (Tex. App.—Tyler 2008, no pet.)]. However, "a trial court abuses its discretion in dividing the community estate without knowledge of its extent and proof of its value." *Bradshaw* . . . , 555 S.W.3d [at] 549 . . . (Devine, J., concurring); *Finn v. Finn*, 658 S.W.2d 735, 746 (Tex. App.—Dallas 1983, [writ ref'd n.r.e.]).

*In re Marriage of Hardin*, 572 S.W.3d 310, 313–14 (Tex. App.—Amarillo 2019, no pet.); *see also Touponse v. Touponse*, No. 02-20-00285-CV, 2021 WL 2753504, at *5 (Tex. App.—Fort Worth July 1, 2021, no pet.) (mem. op.) (stating that "[i]f a mischaracterization has only a slight effect on the trial court's division of the community estate, the error does not require reversal" but that "if the mischaracterization is of such magnitude that it affects the just and right division of the community estate, we must remand the entire case to the trial court for another division based on the correct characterization of the property"). For example, errors that have a *de minimis* effect on the division, such as in the range of two to three percent, do not require reversal and remand. *Monroe v. Monroe*, 358 S.W.3d 711, 718 (Tex. App.—San Antonio 2011, pet. denied) (op. on reh'g) (construing as *de minimis* the trial court's mischaracterization of separate property as community property—where the value of the mischaracterized separate property was less than two percent of the community estate); *Grossnickle v. Grossnickle*, 935 S.W.2d 830, 851 (Tex. App.—Texarkana 1996, writ denied) (op. on reh'g) (holding that error of three percent in division of estate did not warrant remand).

**2. We conclude that the trial court did not abuse its discretion by considering a potential recovery in Husband's personal-injury suit.**

In subsection B of his second issue,[2] Husband argues that the trial court abused its discretion because it allocated certain medical debt to Husband in reliance on his expectancy of a recovery in the personal-injury suit that he was pursuing against Uber. To support this argument, Husband relies on cases holding that unearned future income is separate property, which may not be divested in a divorce. The trial court did not violate this rule. Instead, it considered the potential recovery in assigning liability as a factor in its division of the community estate. Thus, the rule that Husband cites establishes a rule that the trial court did not violate.

Briefly, Husband testified that he was seriously injured while riding in an Uber. At the time of the divorce trial, Husband's counsel in the personal-injury suit had made a settlement demand of $680,000, which the defendant had countered at $15,000, but the suit had not been set for trial.

The decree awarded Husband "[t]he portion of any proceeds arising out of [his] lawsuit with Uber which would be reimbursement for medical bills or lost earnings." The decree provided that Husband shall pay "[a]ll of [his] medical liabilities."

The trial court's findings deal with the Uber suit as follows:

49. The [c]ourt finds by clear and convincing evidence that the following is Husband's separate property:

_____

[2]Husband uses subsection A of his second issue to set forth the standard of review; his substantive arguments appear in subsections B through H.

23

. . . .

b) The portion of the lawsuit against Uber that is not reimbursement for medical bills or lost earnings.

The findings also explained the type of consideration that the trial court had given the Uber suit and how that consideration had impacted the trial court's resolution:

35. The [c]ourt did not place the Uber lawsuit on the [property-division] spreadsheet as a line item; however, the [c]ourt considered the potential settlement, [and] the potential settlement was a small part of the [c]ourt's decision regarding equities.

36. The [c]ourt finds that . . . Husband spent a large sum of cash on what he characterized as medical expenses relating to the injury from the Uber accident on treatments [that] he [had] found through Groupon.

37. . . . Husband's actions will likely make it impossible for the community to be reimbursed from . . . [H]usband's mostly separate property lawsuit for those portions of the medical expenses.

38. The [c]ourt considered the medical bills and cash spent on treatments for injuries resulting from that lawsuit in the division of property.

39. Husband has a potential to have the non-cash expenditures . . . reimbursed from the lawsuit.

40. The [c]ourt's consideration of the Uber lawsuit was part of the totality of the circumstances and not an independent cause for the disproportionate share of the community.

As an initial matter, Husband does not attack the trial court's characterization of the Uber suit. Characterizing the suit overall as separate property—with certain discrete recoveries being community property—is a correct characterization of the

24

suit. Specifically, "a recovery for personal injuries sustained by the spouse during marriage is that spouse's separate property, except any recovery for loss of earning capacity, medical expenses, and lost wages during the marriage." *Farmers Tex. Cnty. Mut. Ins. Co. v. Okelberry*, 525 S.W.3d 786, 793 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); *see also* Tex. Fam. Code Ann. § 3.001(3) ("A spouse's separate property consists of . . . the recovery for personal injuries sustained by the spouse during marriage, except any recovery for loss of earning capacity during marriage.").

Instead, Husband argues that the trial court could not rely on a potential recovery in the Uber lawsuit because a recovery in that suit was speculative, i.e., it was merely an expectancy. Specifically, Husband argues that

> [t]he pending lawsuit was not part of the marital estate because any future value is unknown and unguaranteed. . . . Husband was harmed by the trial court's consideration of the lawsuit because Husband was assigned all of the existing medical liabilities with no guarantee that he will receive any value from the lawsuit to balance out that debt. Instead, the court should not have considered the lawsuit[] and should have equitably divided the medical liabilities. This is especially true considering that if Husband does receive a future award or settlement, any potential community interest in that award could be properly divided in the future when the actual value would be known.
>
> Therefore, it was improper for the trial court to consider the pending lawsuit when dividing the marital estate because it was a mere expectancy interest. . . . The court's error resulted in an unjust division because Husband was assigned all of the existing medical debt based on his *potential* to recover medical expenses in the future. Accordingly, this [c]ourt should remand for a new trial. [Record reference omitted.]

But the cases that Husband cites for the principle that a trial court cannot consider an expectancy establish that rule in a context untethered to his argument:

25

the cases hold that a trial court cannot characterize future income as community property. One of the primary opinions that Husband relies on is *Murray v. Murray*, 276 S.W.3d 138 (Tex. App.—Fort Worth 2008, pet. dism'd). *Murray* dealt with a challenge to a divorce decree because it granted one spouse a portion of the other spouse's future income, which was not community property. *Id.* at 146.

The question in *Murray* turned on whether the award gave the receiving spouse income resulting from a hoped for but not yet occurring contingency, which was the addition of new customers and brokers to the earning spouse's business. *Id.* at 148. Thus, the funds received in the event that such a contingency occurred was future income, which was separate property. As *Murray* explained,

> Because the addition of new members and brokers is not a guarantee, the growth in income resulting from new members and brokers is merely an expectancy. Furthermore, although [the spouse who might earn the income] has significant rights as to the income stream earned during marriage, he does not and cannot have any rights in something he has yet to acquire. Therefore, any growth in income resulting from new members and brokers being added after the divorce is [the earning spouse's] separate property.

*Id.* *Murray* relied on cases with holdings that stand for the proposition that the mere expectation of future income is not a community asset because it has not yet been earned. *See Loaiza v. Loaiza*, 130 S.W.3d 894, 906–07 (Tex. App.—Fort Worth 2004, no pet.) (holding the fact that ballplayer signed contract to play in future year during marriage did not make future income community property because the income was not earned until the post-divorce services were performed); *see also Von Hohn*, 260

26

S.W.3d at 641 (holding that because no money had been received by husband's law firm from pending but unsettled cases, revenue from those cases was no more than an expectancy interest, and any money to be received constituted future earnings to which wife was not entitled because they were separate property).

At bottom, the trial court did not violate the rule of *Murray* or the other cases cited because the trial court did not mischaracterize future income. Instead, the trial court considered the Uber lawsuit to the extent that "Husband has a potential to have the non-cash expenditures . . . reimbursed from the lawsuit." To challenge this consideration, Husband attempts to transmute a rule about the characterization of future income into one that makes it a per se abuse of discretion to consider future events as a factor in determining a just and right division. So broad a rule is contrary to the *Murff* factors, several of which look to what may but is not guaranteed to happen in the future, such as the spouses' business opportunities and earning capacity. 615 S.W.2d at 699 (stating that trial court may consider spouses' earning capacities and abilities, benefits that the party not at fault would have derived from continuation of the marriage, business opportunities, education, relative physical conditions, relative financial condition, and obligations).

Admittedly, the cases cited by Wife provide no bright-line guidance on the issue. The one opinion offering a bit of guidance is *Osborn v. Osborn*, 961 S.W.2d 408 (Tex. App.—Houston [1st Dist.] 1997, pet. denied). *Osborn* dealt with a "personal[-] injury lawsuit [that] had not yet been tried and had not settled." *Id.* at 413. One

spouse challenged the sufficiency of the evidence supporting a finding "that characterized his personal[-]injury lawsuit as community property." *Id.* *Osborn* devoted most of its discussion to issues that we have already discussed about which portions of a personal-injury recovery are community and which are separate. *Id.* at 414–15. At the end of the day, *Osborn* concluded that the trial court's characterization of the potential personal-injury recovery was incorrect. *Id.* To correct the trial court's error, the Houston First Court of Appeals remanded for the trial court to perform the following task:

> [T]he trial court is required to properly characterize the damages sought by the personal[-]injury lawsuit. The damages for [the injured spouse's] personal injury are his separate property; the damages for [the other spouse's] claim for loss of consortium are her separate property; the damages for [the injured spouse's] lost wages, medical costs, and other expenses are community property. Because we cannot determine if the mischaracterization affected the trial court's just and right division, we remand the entire community estate for a just and right division based on properly characterized property.

*Id.* at 415. The most we can glean from *Osborn* is that the First Court of Appeals saw no impediment in characterizing the suit and considering it in its division of the estate of the parties, even though it viewed a recovery in the suit as being speculative. *Id.* The trial court here went no further than *Osborn* in its consideration of the Uber suit.

And here, there was an additional factor because the trial court found that Husband's method of payment for a large portion of his medical bills made it unlikely that they could be recovered in the Uber suit. Again, the trial court found that

28

36. . . . Husband spent a large sum of cash on what he characterized as medical expenses relating to the injury from the Uber accident on treatments [that] he [had] found through Groupon.

37. . . . Husband's actions will likely make it impossible for the community to be reimbursed from . . . [H]usband's mostly separate property lawsuit for those portions of the medical expenses.

These are factors beyond a potential recovery in the Uber suit for the trial court's actions; Husband placed the community in a position where it could potentially not recover a large portion of the medical debt that he claims Wife should share. As Wife points out, Husband does not attack these findings.[3]

We overrule subsection B of Husband's second issue.

---

[3]In his reply brief, Husband challenges Wife's statement that he did not attack these findings, apparently because his opening brief made the general statement that "Husband challenges findings 7 through 52, as discussed more specifically in each subsection below." Husband's opening brief does not even mention findings 36 and 37. We are under no obligation to test an unchallenged finding for evidentiary support. *See Sister Initiative, LLC v. Broughton Maint. Ass'n, Inc.*, No. 02-19-00102-CV, 2020 WL 726785, at *4–5 (Tex. App.—Fort Worth Feb. 13, 2020, pet. denied) (mem. op.). Husband's fourteen-word challenge to forty-five findings is not a viable method to claim that he has challenged a specific finding simply because it fell within the number range of the findings that his general statement lists.

**3.** **We conclude that the trial court potentially abused its discretion by awarding Husband an account that Wife testified had been "drained."**

In subsection C of his second issue, Husband argues that the trial court abused its discretion because it awarded an account to him that Wife later testified had been drained. We agree that this act is a potential abuse of discretion but hold that even if it was error, it did not render the division of the estate manifestly unjust.

Husband's contention focuses on a Merrill Edge account that was awarded to him and that the trial court found to contain $25,187.[4] However, Wife testified at a post-trial hearing that the following had occurred with respect to the account:

Q. Was a Merrill [Edge] account awarded to you [in an earlier rendition]?

A. Yes, but it's been drained.

Q. When was that drained?

A. It's been drained for a while as far as paying all my lawyer costs.

Q. Was that from before the divorce or as of the divorce?

A. It was in the process of. It's been drained for a while.

Q. So it's at a zero balance now?

A. Well, I put some of the loan that I got in there but, yes.

---

[4]Appellant's brief points out that the trial court referred to the account as a Merrill Lynch account instead of as a Merrill Edge account.

Wife argues that property should be valued at the time of divorce and that the fact that the asset is now worthless is a nonevent. Husband argues that although assets are usually valued at the time of divorce, that principle is not immutable. Husband cites to a prior opinion of this court to establish the principle that the date of valuation is a matter of the trial court's discretion:

> The value of community assets is generally determined as of the date of divorce or as close to that date as possible. *Quijano v. Quijano*, 347 S.W.3d 345, 349 (Tex. App.—Houston [14th Dist.] 2011, no pet.). However, we have held that the facts of a particular case may necessitate some other basis for the property division and that this decision should be left to the discretion of the trial judge to avoid the inequities that could result by establishing a bright-line rule. *See Parker*[ *v. Parker*], 897 S.W.2d [918,] 932 [(Tex. App.—Fort Worth 1995, writ denied), *overruled on other grounds by Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998).]

*Finley v. Finley*, No. 02-11-00045-CV, 2015 WL 294012, at *10 (Tex. App.—Fort Worth Jan. 22, 2015, no pet.) (per curiam) (mem. op.). A valid argument may be made that a trial court abuses its discretion when it divides an estate based on the value of an account at the time of the filing of the divorce, but the evidence shows that the asset had disappeared before the final decree was entered because of the actions of one of the spouses. But we need not reach that question because, as we explain below, we conclude that even if an error in the award of the account occurred, such error did not make the division otherwise manifestly unjust.

We overrule subsection C of Husband's second issue.

31

**4.    We conclude that the trial court did not abuse its discretion in its valuation of Husband's interest in an investment firm.**

In subsection D of his second issue, Husband attacks the trial court's findings that value his interest in the investment firm—Helix Financial Group—of which he was a part owner. The attack takes two approaches: (1) Wife's expert's opinion about the value of Helix was unreliable because of a failure by the expert to recognize that Helix did not have any accounts receivable; and (2) the trial court's valuation of the firm was based on its own view of the goodwill that existed in the firm, and its own view contradicted the opinions of the experts who testified. We reject both contentions.

**a.    We set forth the accounts-receivable error that Husband claims made Wife's expert's opinion unreliable.**

In the first portion of Husband's argument in subsection D of his second issue, Husband argues that Wife's expert's opinion of the value of Helix was unreliable because the expert made an error about whether the company had accounts receivable. Husband waived his reliability challenge by not making it at trial and by making no argument regarding how the expert's opinion remained unreliable after he corrected the error regarding accounts receivable.

Wife's expert originally valued Husband's interest in Helix at $104,900. Wife's expert used an asset approach to value Husband's interest in Helix. One of the assets the expert included in his asset valuation was accounts receivable, which had a value

of $30,400.[5]  On cross-examination, Husband's counsel pointed out that Helix did not carry any accounts receivable, and the expert immediately reduced his value of Husband's interest to $82,000 to account for the fact that there were no accounts receivable.

As a result of this error, Husband argues that "Wife's expert admitted that his calculations contained error and were based on assumptions about the business'[s] assets.  As such, his testimony was not reliable evidence of Helix's value, and the trial court erred by relying on Wife's expert's value when valuing Husband's business." [Record reference omitted.]   But Husband does not cite to any objection that he lodged in the trial court regarding the reliability of the expert's opinions.  Such an objection is required when a challenge is made to the reliability of an expert's methodology; one of the reasons for requiring an objection is that it gives the expert an opportunity to correct computational errors.  *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 786 (Tex. 2020) (stating that "[r]equiring an admissibility objection to the reliability of expert testimony gives the proponent a fair opportunity to cure any deficiencies and prevents trial and appeal by ambush" and that "when an expert opinion 'is admitted in evidence without objection, it may be considered probative evidence even if the basis of the opinion is unreliable'").

---

[5]The record uses $30,200 one time, but the rest of the time the value was placed at $30,400.  We therefore use the latter value.

Further, Husband's argument focuses on the expert's error and not its correction. Here, Husband's counsel pointed out the flaw, and Wife's expert changed his calculation to address it. The matter dropped. Husband's counsel then discussed the issue with Husband's expert, who testified that the error would result in a $22,000 to $23,000 correction—the correction that Wife's expert made. So the question is not whether Wife's expert's opinion was unreliable because it contained a flaw but whether the opinion was unreliable after the flaw was corrected. Husband's brief leaves this question unanswered, presumably because the record would not support the argument.

> **b.** **Husband claims that the trial court's findings show that its determination of Husband's interest in Helix is not supported by the evidence.**

In the second portion of Husband's argument in subsection D of his second issue, Husband argues that the trial court made findings that indicated that it disagreed with both Husband's and Wife's experts' opinions and made an adjustment to the value of Helix attributable to Husband when there was no evidence that supported the adjustment. The record does not support his argument. The trial court made a finding that it disagreed with the percentage of goodwill assigned to Husband by both experts, but the value that the trial court placed on the interest was that assigned by Wife's expert. Although the findings indicate that it might have been the trial court's impulse to assign a higher value, it did not act on that impulse and instead placed the value within the range of values offered by the experts.

34

The trial court found the value of Husband's interest in Helix to be $82,000.

The trial court's findings with respect to Husband's interest in Helix are as follows:

> 44. The [c]ourt finds that due to . . . Husband's lack of involvement in the business, . . . [Wife's expert's] estimation of his imputed salary was more accurate.
>
> 45. This [c]ourt finds that neither expert was aware that the partner was engaged in the primary day-to-day contact with clients and that they both were in error to assign 50% of the goodwill to Husband. This finding is made based upon the testimony of both experts and Husband's testimony on the level of his day-to-day involvement.

With respect to the value of Husband's interest in Helix, Husband's and Wife's experts disagreed about the value of Husband's interest in Helix; Husband's expert placed the value at $37,000, and Wife's placed it at $82,000—the value found by the trial court. The delta between the two values was largely attributable to the compensation adjustment made by the experts about what income figure would be attributed to each of the owners.

Husband's expert described the process of using compensation to make an adjustment to an income-based approach that he used: "As part of the valuation process, you always need to make normalizing adjustments to the income statements for a variety of reasons. In this case, the primary adjustment that was required was to adjust the officer compensation paid to the two owner operators of the business." Husband's expert opined that $175,000 annual compensation to each partner was reasonable market compensation. Wife's expert opined that a lower figure of approximately $62,000 was reasonable.

35

Wife's expert described how the differing compensation figures impacted the value determination:

> So, essentially, we both -- in our first appraisals, we both pretty much use the same unadjusted data. And I made an adjustment to salary for about $124,000, so I reduced the unadjusted income by $124,000. So that causes my after[-]tax income to be [$]219,000. And [Husband's expert's] adjustment was substantially higher[,] and their after[-]tax income that they capitalize was about $21,000.
>
> So we're both capitalizing or, I guess to simplify, we're both, kind of, multiplying our adjusted net income by about 5 to get to -- about 4 to 5 to get to our overall appraised value. And so I end up with a much higher appraised value than [Husband's expert] does.

Both experts then addressed a distinction between the goodwill attributable to the firm and that attributable to the individual owners. Wife's expert described the process in the following way:

> And then we simply both compare our appraised value to the unadjusted net asset value of the firm and come up with an amount for goodwill. And then I ultimately reduced the goodwill by 75 percent to account for potential personal goodwill of the two working owners.
>
> And [Husband's expert] used -- they made a note that they thought there couldn't be any divisible goodwill in the business, but they did arrive at a divisible value, allowing for some un-divisible goodwill.
>
> They ended up -- they ended up with a value of about -- let's see -- $75,000. And just that, we don't really know, kind of, what the goodwill is, but we're going to allow for $75,000 of value and then 50 percent of it is attributable to [Husband].

Wife's expert apparently opined that the firm had its own goodwill because it received recurring income, such as recurring monthly fees.

36

The process of segregating between the goodwill of the firm and that of the owners is necessary because the former is a community asset, while the latter is not. As we have explained,

In terms of valuation, there is a distinction between the goodwill that attaches to a professional person because of confidence in that individual's skill and ability and the commercial goodwill of a business that arises from its location, its well-established and well-recognized name, or something that otherwise separates it "from the skills or attributes of an individual member." *Salinas v. Rafati*, 948 S.W.2d 286, 290–91 (Tex. 1997); *Hill v. Hill*, No. 02-12-00332-CV, 2014 WL 92795, at *5 (Tex. App.—Fort Worth Jan. 9, 2014, no pet.) (mem. op.). Only "[g]ood[]will that exists separate and apart from a professional's personal skills, ability, and reputation is divisible upon divorce." *Hill*, 2014 WL 92795, at *5; *Keith v. Keith*, 763 S.W.2d 950, 952 (Tex. App.—Fort Worth 1989, no writ). To determine whether goodwill that is subject to division upon divorce attaches to a professional practice, goodwill first must be determined to exist independently of the personal ability of the professional spouse, and then if such goodwill is found to exist, the court must determine whether that goodwill has a commercial value in which the community estate is entitled to share. *Hill*, 2014 WL 92795, at *6; *Von Hohn . . .* , 260 S.W.3d [at] 638[.]

*K.T. v. M.T.*, No. 02-14-00044-CV, 2015 WL 4910097, at *8 (Tex. App.—Fort Worth Aug. 13, 2015, no pet.) (mem. op.).

We have gone through the process of describing the methodologies used by the experts and their reasons for making the goodwill distinctions that they did in order to demonstrate that the trial court had before it two qualified experts testifying about their respective valuation methodologies. In this situation, the trial judge became the referee in a classic battle of the experts. The case that we have just cited about the goodwill distinction described the trial court's role in that battle as follows:

37

The litigation of this issue involved a classic battle of the experts. In a battle of competing expert testimony, it is the sole prerogative of the fact[]finder to determine the weight and credibility of the witnesses, the obligation of the respective advocates to persuade them, and "our obligation to see that the process was fair and carried out according to the rules."

*Id.* at *9. And when a factfinder is presented with a viable range of values (such as when a trial court is refereeing a battle of the experts), the factfinder may choose a value within that range. *Van Heerden v. Van Heerden*, 321 S.W.3d 869, 880 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (explaining that when valuing assets of the estate of the parties, "if several values are given, or if a witness testifies that the value may be higher or lower than his estimate, the court's determination of the value should be within the ranges in the evidence").

Here, the trial court properly performed its job of referee. It reconciled what it had heard from the parties' experts and selected a value falling within the experts' opinions. In this case, it chose the opinion of value offered by Wife's expert.

Admittedly, the trial court also offered its own view that neither expert had properly assessed Husband's goodwill: "This [c]ourt finds that neither expert was aware that the partner was engaged in the primary day-to-day contact with clients and that they both were in error to assign 50% of the goodwill to Husband." We do not know why the trial court made this finding, perhaps to bolster why it went with Wife's expert's opinion. And Husband attempts to capitalize on the finding by arguing that

[h]ere, the trial court erred by finding that "both [experts] were in error to assign 50% of the goodwill to Husband." Because both experts had

reduced their final valuations to account for personal goodwill, the trial court's finding indicates that the court *increased* the final value it assigned to Helix. Any *increase* in the value of Helix based on the commercial goodwill of the firm or the personal goodwill attributable to Husband's partner was improper because there was no evidence to establish that the community estate was entitled to share in such goodwill. [Emphasis added.] [Record references omitted.]

But this argument misses the mark because no matter what the trial court said in the cited finding, the trial court did not increase the value that it found beyond a value that was in the range of the testimony before it. So no matter its expression of disagreement with the experts, the trial court stayed within the boundaries set by the evidence.

We overrule subsection D of Husband's second issue.

### 5. The trial court did not abuse its discretion by failing to consider Husband's medical debt and tax liability.

In subsection E of his second issue, Husband makes two challenges to the trial court's division of debt. First, he claims that the trial court failed to consider his medical debt in making its division; however, the findings show otherwise. Second, Husband contends that the trial court committed an abuse of discretion because it understated Husband's 2018 and 2019 tax liability by $19,000, claiming that the trial court found it to be $37,000 when it was instead north of $56,000. We are unconvinced of the gravity of the miscalculation, even if it occurred. The trial court assigned each party his or her tax liability resulting from his or her earnings and expressed the view that its rulings on tax liability would have little impact on the IRS's

ultimate determinations. Nor was the trial court under an obligation to calculate the amount of tax liability. These factors show the limited impact that an error in the calculation of tax liability has on the division of the community estate.

### a. The medical debt

To address the first portion of Husband's argument under subsection E of his second issue, the trial court initially noted in its findings that (1) it had "examined the record regarding debt" and (2) "[t]he parties had less than $1,000 in debt other than medical debt and taxes." Husband's inventory shows medical debt of $56,228.68. Husband testified that he had incurred medical bills for the Uber accident and that those were listed in the inventory and appraisement. There was no dispute at trial about the amount of the expenses. The decree provided that Husband would pay all of his medical expenses. When referencing the Uber suit, the trial court's findings stated that it had "considered the medical bills and cash spent on treatment for injuries resulting from that lawsuit in the division of property."

First, Husband noted that the trial court did not place a value on the medical debt in the decree or in its findings. But the trial court was not required to make findings on facts not in dispute. *See* Tex. Fam. Code Ann. § 6.711(a) ("In a suit for dissolution of a marriage in which the court has rendered a judgment dividing the estate of the parties, on request by a party, the court shall state in writing its findings of fact . . . on which *disputed* evidence has been presented." (emphasis added)).

The focus of Husband's argument is that it was an abuse of discretion for the trial court not to consider the medical debt in its division. Specifically, Husband argues that

> [b]ecause the only evidence regarding Husband's medical liability established the value as $56,228.68, the court could not have drawn a different inference regarding the existence and value of the liability. . . . As such, the court's *failure* to consider the extent of Husband's medical liability when dividing the estate further shows that the court's division was manifestly unjust. [Emphasis added.]

The implication of this criticism is that the trial court in some way ignored the medical expenses in the property division because the trial court did not reference the amount of the debt in making its division. That criticism is unfounded. It appears that the medical expenses that Husband listed in his inventory were those related to the Uber accident, there was no dispute as to the amount of the medical expenses, and the trial court explicitly stated that it had considered those expenses in making its division.

### b.      The tax liability

As noted above, in the second portion of his argument under subsection E of his second issue, Husband argues that the trial court erred in its division of the estate of the parties because it made a $19,000 computational error in the amount that he owed for the 2018 and 2019 income taxes.

In its decree, the trial court specified that Husband and Wife would each pay taxes due and owing on their respective earnings. Husband and Wife had filed separate tax returns in 2018 and 2019 while the divorce was pending. The trial court's

findings with respect to tax liability were rather vague with the intent appearing to be that the question of what was due was a matter between the parties and the IRS:

> 27. There was contradictory evidence as to whether there was $48,625.00 in IRS debt; however, it appeared from the evidence, that had been paid.
>
> 28. In addition, there was money owed to [Wife's expert] and attorney's fees to [Wife's counsel]. [Husband's] Inventory indicated that there was $37,000 in unpaid IRS debt that . . . Wife may or may not have paid.[6]
>
> 29. The parties will be joint and severally liable on joint tax debt, unless a party can convince the IRS otherwise.
>
> 30. The IRS has little interest in the division this [c]ourt will determine regarding IRS debt.
>
> 31. The [c]ourt finds that Husband testified that he has deducted more than $37,000 in cash medical expenses that cannot be documented for IRS purposes. As such, asking . . . Wife to sign off on a tax return with him would not be fair, just, and equitable under the circumstances.

Husband's attack centers on finding 28 and contends that the trial court misread his inventory to mean that the amount of taxes listed in the inventory was the balance due before he made the payments that were referenced in the inventory when what it actually showed was the balance due after the payments had been made. Because of this error, the trial court miscalculated the tax liability to be $37,000 when it was actually $19,000 higher.

---

[6]It appears that the reference to Wife in this finding is a typo and should be a reference to Husband.

As a general proposition, "[w]hile a tax liability is not technically a 'debt,' a court may take tax liability into consideration in the division of property upon divorce[] and may even require one party to assume the other's tax liability." *Mullins v. Mullins*, 785 S.W.2d 5, 7 (Tex. App.—Fort Worth 1990, no writ).

Husband's claim of error appears to be predicated on the proposition that a trial court must calculate tax liability as part of the division of the estate of the parties.[7] The proposition is incorrect; the trial court may assign tax liability to one spouse, even if it is uncertain of the amount of the tax:

> [T]here are Texas cases in which courts appropriately assigned tax liability to one party or the other without knowing the exact amount of that liability. *See Kimsey v. Kimsey*, 965 S.W.2d 690, 695–96 (Tex. App.—El Paso 1998, pet. denied) (finding no manifest abuse of discretion where trial court divided tax liability equally between parties despite no evidence of amount of potential tax liability[] but remanding in part because court failed to specify whether parties were to file jointly or separately); *Mullins . . .* , 785 S.W.2d [at] 7–8 . . . (holding trial court acted within its discretion in holding husband responsible for potential income[-]tax liability incurred during marriage); *see also Young v. Young*, 168 S.W.3d 276, 286 (Tex. App.—Dallas 2005, no pet.) (holding trial court did not err in assigning responsibility of couples' income[-]tax liability to husband where evidence indicated he had failed to report certain income); *Benedict v. Benedict*, 542 S.W.2d 692, 698 (Tex. App.—Fort Worth 1976, writ dism'd) (finding trial court acted within its authority in ordering husband responsible for entire estimated tax liability where he had failed to file tax returns for several years).

---

[7]The evidence of the amount of Husband's tax liability is not clear. His 2018 tax return showed $17,450 in taxes due. He introduced another document from the IRS allegedly showing $27,587.48 due for 2018. His 2019 return showed $23,909 due. He "believed" that the 2019 taxes were $33,000 or $35,000 at the time of trial.

*Quijano*, 347 S.W.3d at 352; *see also Markey v. Markey*, 634 S.W.3d 293, 296 (Tex. App.—Amarillo 2021, no pet.) (mem. op.) ("[A] court does not abuse its discretion in dividing the community estate simply because it did not first calculate income[-]tax liability. It may divide the estate without first undertaking same.").

And, as noted, the trial court basically decided that the IRS would be the one to determine the tax liability. We recently discussed that this is an approximate disposition of the tax-liability issue:

> [T]he trial court left it up to the IRS to determine whether any taxes were owed, who owed them, and who would pay them. In short, the trial court left that matter for later clarification. Courts may enter orders of enforcement and clarification to enforce or specify more precisely a decree's property division. *Hagen*[ *v. Hagen*], 282 S.W.3d [899,] 902 [(Tex. 2009)] (citing Tex. Fam. Code Ann. § 9.006(a)). If a decree is ambiguous, a court can clarify it. *Pearson*[ *v. Fillingim*], 332 S.W.3d [361,] 363 [(Tex. 2011)] (citing Tex. Fam. Code Ann. § 9.006). Assuming that the liability, if any, was joint, and assuming that either [husband] or [wife] had paid it in full, neither one would be without recourse because "[i]t has long been the law in this State that one who involuntarily pays a joint debt in full is entitled to contribution from other joint debtors of their proportionate share of the joint debt . . . ." *Strange v. Rubin*, 456 S.W.2d 416, 419 (Tex. . . . App.—Dallas 1970, writ ref'd n.r.e.).

*Hamilton*, 2020 WL 6498528, at *10.

And to show error in a property division, a party must show more than merely a computational error occurred. It remains Husband's burden to show that the computational error in the tax-liability amount made the division of the estate of the parties manifestly unfair and unjust. *See Markey*, 634 S.W.3d at 297.

As the trial court noted, tax liability is a matter beyond its control, and so it left each of the parties to bear the tax liability for his or her own earnings. Because it is difficult to quantify a couple's tax liability, the trial court has no obligation to do so. And once the tax liability is quantified, there are avenues to address an imbalance in the division of the estate of the parties. Further, though the parties apparently hoped that the IRS could be convinced that no tax was owed, the IRS claimed that Wife owed taxes on approximately $48,000 in stock transactions, and Wife asked that if any taxes were owed on that amount, Husband be ordered to contribute to their payment. With a muddled record as to what was owed in taxes and who would owe it, the lack of an obligation on the trial court to calculate what might be due, and avenues to address payments made by one spouse for income attributable to the other, we conclude that even if the trial court misread Husband's inventory, the trial court's actions in assigning each spouse the tax for his or her respective income did not make the division of the estate of the parties manifestly unjust.

We overrule subsection E of Husband's second issue.

### 6. The record does not establish that harmful error occurred because of the trial court's refusal to permit Husband to question Wife's former counsel about attorney–client communications.

In subsection F of his second issue, Husband argues that he was harmed by the trial court's refusal to require Wife's former attorney to testify about attorney–client communications and to admit into evidence a recording made by Husband of a

45

conversation between Wife and her attorney. Husband sets the stage for his argument with the following introduction:

> A prominent issue at trial was whether Wife was engaging in a sham real[-]estate transaction, in which she claimed to be renting the Shady House from her best friend but was actually using community funds to purchase the house. Wife blatantly misrepresented about having a lease for the Shady House[,] and the trial court improperly excluded evidence that would establish Wife's perjury. Moreover, the evidence that was admitted established that Wife wasted far more than $90,152.72.[8]

Husband's brief then describes the exclusion of the testimony as harmful. But Husband never carries through in fleshing out two of the signals sent by his brief. He never explains how Wife wasted far more than $90,000. And more importantly, he never tells us in the context of the trial court's findings and the other evidence in this case how the trial court's rulings, even if they were error, caused harmful error.

To begin, the trial court made the following findings about Wife and the house that was the focus of Husband's charges that Wife was dishonest:

> 19. The [c]ourt finds that . . . Wife wasted $90,152.72. The [c]ourt finds that Wife spent funds on the home that she is renting from a male friend.

> 20. The [c]ourt finds that Husband spent in excess of $140,000 in attorney's fees in this case.

> 21. A large portion of this was to attempt to obtain communications to prove a claim when . . . Wife admitted to the actual transactions[] although[] she did not admit to the characterization of the transactions as "waste."

---

[8]The house is located on Shady Brook. As a rhetorical device, Husband terms it the "Shady House."

22.  The expenditures on the house . . . Wife was renting were well-documented and blatant and did not require excessive discovery to prove.

The trial court then made the following conclusions with respect to the house that was in controversy:

2.  The [c]ourt concludes Husband's allegation that Wife owned an interest in the real property at . . . Shady Brook was not supported by the evidence.

3.  The [c]ourt concludes that . . . [W]ife did waste substantial community funds, enumerated herein, on the property commonly known as . . . Shady Brook.

Much of the trial was consumed with Husband's ongoing efforts to prove that the purchaser of the Shady Brook house acted as a straw man for Wife and that the house was actually hers.  We quote from Husband's brief to catalog those efforts:

Here, Husband made a prima facie showing that Wife was contemplating the commission of a fraud[] or that it had been ongoing, regarding the Shady House.  First, Wife claimed that a written lease was created around when she moved into the Shady House, which was November 2018.  However, Wife did not produce any lease until January 27, 2020, and Wife's discovery response sent on June 18, 2019[,] even denied the existence of any written lease, stating, "As previously discussed, no written lease exists.  Producing a written lease would require creating a document."

Second, when Wife eventually produced a lease, she produced multiple versions showing different signatures, and the date of the signatures pre-dated when the house was purchased.

Third, Wife's cash transactions suggested fraudulent activity.  Wife withdrew $3,000 in cash on October 4, 2018, and [the alleged straw purchaser] paid the $3,000 earnest money on the house on October 5, 2018.  Additionally, despite having no obligation under her "lease," Wife was making improvements to the Shady House using large cash

47

payments. Wife had her sister use a credit card to pay for a new fence for the house, and then Wife repaid her with approximately $3,500 in cash.

Finally, Wife's own testimony established that she was heavily involved in selecting the Shady House and was the primary contact with the realtor; [the alleged straw purchaser] never personally saw the house before it was purchased. Wife had numerous phone calls and exchanged many text messages with [the alleged straw purchaser] and with the realtor[] but conveniently deleted all of her text messages with [the alleged straw purchaser] and the realtor, despite being under temporary orders prohibiting her from destroying or disposing of any text messages. [Record references omitted.]

Husband deposed the alleged straw purchaser and the realtor representing him and introduced portions of those depositions into evidence. Husband's lawyer also asked Wife's former lawyer, when that lawyer testified at trial, if he had ever described the lease that Wife produced as looking "fishy," and the lawyer denied making that statement. The lawyer was also asked and denied that he was aware from people other than Wife that a lease did not exist as early as she claimed.

Even with the evidence that he marshalled and the questions that his counsel was able to ask Wife's former lawyer, Husband claims the trial court erred when it would not permit questions that Husband describes as "focused on whether Wife falsified a lease for the Shady House[] and included questions such as [the following:] 'Did [Wife] ever tell you that her previous attorney said she did not need a lease?'" He argues that the crime–fraud exception to the attorney–client privilege permitted the questions to be asked. *See* Tex. R. Evid. 503(d)(1). He also argues that Wife's counsel had opened the door to the question by virtue of questions that he had asked

48

Wife. Finally, Husband claims that the trial court erred when it would not admit a recording that he had made of a discussion between Wife and her former lawyer during a break in a deposition in which Wife "admitted that she [had] created the lease between herself and [the alleged straw purchaser] for the purposes of this litigation."[9]

To briefly address the question of the recording, the trial court would not admit it because it was not produced in the parties' discovery.[10] Husband does not challenge this ruling.

_____

[9]Husband switches gears in his reply brief and raises an argument that appears to be a factual-sufficiency argument in which he marshals all the bad acts that he claims that Wife committed with respect to the alleged straw purchase. After doing so, he argues that "Wife repeatedly perjured herself and the falsity of her testimony was established by the evidence at trial. Therefore, it was unreasonable for the court to render a division so disproportionately in Wife's favor." We can analyze legal arguments put to us but do not have a metric to analyze whether the trial court made an improper decision about who was the worse spouse when each spouse claims that the other's conduct is questionable.

[10]The following discussion about the recording occurred in a hearing on a motion for new trial:

THE COURT: Okay. Was it an on-the-record, or was it between -- tell me a little bit about this recording.

[Husband's counsel]: So what you'll read in the offer of proof was that during a break in the deposition, you know how people go use the restroom, things like that. The door was open. [Wife's former counsel] stayed in the room with his client. [Husband] was just outside the room, and they were talking loud enough that they could be heard outside the room with the door open so there's no privacy issues there that would fall under attorney–client privilege.

So he heard them talking about the lease and started recording that and that's how we have that information.

49

And we will not reach the question regarding whether the trial court erred by not permitting Wife's former lawyer to ask the questions put to him. To show harm from the exclusion of evidence is a strenuous standard:

> To obtain reversal of a judgment based on the erroneous . . . exclusion of evidence, an appellant must show that the trial court's ruling was in error and that the error probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *McCraw v. Maris*, 828 S.W.2d 756, 757 (Tex. 1992). To successfully challenge an evidentiary ruling, an appellant must usually show that the judgment turns on the particular excluded evidence. *See City of Brownsville*[ *v. Alvarado*], 897 S.W.2d [750,] 753–54 [(Tex. 1995)]. An appellate court must review the entire record

---

[Wife's counsel]: And my response at the time was also, Judge, he had this recording, was never produced to me in response to discovery. Didn't offer it at trial. Obviously, we had the conversation, but that didn't change the fact that my client had an expectation of privacy sitting in an office with her lawyer, whether the door's open or closed. [Husband] is standing in the corner somehow with his phone out? Again, that's --

THE COURT: Yeah, I'm going to -- okay. I'm going to continue to sustain the objection part because it wasn't -- for the two reasons at trial: One was that -- and probably the more important one is the discovery issue, that if it wasn't produced --

Do you deny it wasn't produced in discovery?

[Husband's counsel]: I don't believe it was produced.

THE COURT: Okay. So that's independent grounds.

And then I -- you know, standing around the corner recording someone talking to their client when they think they're in a room by themselves, if he was -- you know, that's another issue.

But independently of that, it's a discovery issue, and so -- okay. So I'm going to continue to exclude the recording between [Wife's former counsel] and his client.

50

> to determine whether the case turns on the excluded evidence. *Id.* at 754.

*Ledbetter v. Mo. Pac. R.R. Co.*, 12 S.W.3d 139, 142 (Tex. App.—Tyler 1999, pet. denied); *see also Emami v. Emami*, No. 02-21-00319-CV, 2022 WL 3273603, at *2 (Tex. App.— Fort Worth Aug. 11, 2022, no pet.) (mem. op.) (quoting *Ledbetter* for harm standard).

As we noted when we began the discussion of this issue, Husband claims that the trial court's rulings were "harmful." Yet, he never cites the harmful-error standard or tells us how the rulings caused reversible error.

We conclude that the rulings did not produce harmful error. We have quoted Husband's brief in which he cataloged the numerous items of evidence that he had introduced to establish that Wife was not being truthful about the true nature of the acquisition of the Shady Brook house or the creation of a lease. Indeed, Husband argues in his reply brief that the weight of this evidence as it stands made it "irrational for the trial court in this case to believe Wife." And he never explains why the question that the trial court did not permit—that Wife thought that she did not need a lease but when told that she did, she fabricated one—would have been the icing on the cake that convinced the trial court to change its mind on whether the house was a straw purchase, to conclude that a greater amount of funds was wasted, or to determine that the Shady Brook house involved a straw purchase. Thus, we conclude that based on the evidence that Husband introduced, the judgment in this case did not turn on the excluded evidence.

51

And to a final point, as noted, the trial court found that payments made on the lease were waste. Thus, Husband prevailed on the only claim that he made attacking Wife's expenditure of funds on the Shady Brook house, which was a waste claim. In his brief, Husband mentions no other type of claim that he made to challenge Wife's use of funds on the Shady Brook house other than for waste. Specifically, he states that "[b]ased on this evidence, and the additional evidence presented at the trial, the trial court should have found that all of the funds spent on the Shady House *were wasted* by Wife." [Emphasis added.] But again, Husband never tells us how much more he thinks the trial court should have found Wife wasted with respect to the Shady Brook house. Nor do we understand how the trial court could have given Husband any further relief, such as divesting the alleged straw purchaser of title and making the house a community asset. The purchaser was not a party, and thus, the trial court had no jurisdiction to divest him of title. *See Walsh v. Walsh*, 255 S.W.2d 240, 242–43 (Tex. App.—Amarillo 1952, no writ) (concluding that third party holding title had to be joined in divorce proceeding if judgment divested him of title).

We overrule subsection F of Husband's second issue.

### 7. The trial court did not abuse its discretion by finding that Husband had a greater earning potential than Wife.

In subsection G of his second issue, Husband claims that the trial court erred by finding that he "has a greater earning[] potential than . . . Wife." He argues that he was disabled as a result of the auto accident involving Uber. He also relies on his

testimony that although he had been receiving compensation of more than $10,000 per month from Helix, those payments were largess from his partner and that the payments would end when the divorce was finalized. The premise of Husband's argument is that the trial court was bound to accept his testimony at face value. To the contrary, Husband's testimony presented a fact issue, which the trial court in its role as factfinder resolved against him, as it was entitled to do.

Husband testified that during the course of the divorce, the parties had the following differential in their earnings: Wife brought home about $4,000 per month in income, and he received between $14,000 to $16,000 per month from Helix.

Husband initially told the court that he was not working because of the injuries that he had sustained in the Uber accident:

Q. What's your occupation?

A. I'm a financial advisor, *but I'm not working right now.*

Q. And how long have you not been working?

A. A couple years.

Q. And what's the reason why you've not been working?

A. I was in a car accident, and I've got substantial cervical vertebrae, lumbar vertebrae, left knee, and a problem with my right arm. [Emphasis added.]

However, later in this testimony, Husband retracted his statement that he was not working:

Q. . . . If you had been not working in the business for two years, your partner's been doing all the work; would that be a fair statement?

A. No, sir.

Q. You said you made a call to some older women. Are they generating revenue from those calls?

A. That's not what I said.

Q. All right. So if you're not in the office meeting clients and making investments, is your partner doing all that work?

A. No, sir.

Q. Who's doing it?

A. We both are.

Q. But you testified you're not going into the office and doing it.

A. I can make phone calls from home, and that's what I'm doing.

Whether he was "working" or not, Husband testified that his income stream from his investment firm would end when the divorce concluded. He described the situation as follows:

Q. [Husband], do you anticipate continuing to receive distributions from Helix the way you've been receiving it --

A. No.

Q. -- over the past two years?

A. No, sir.

Q. When does it end?

A. When this thing is over, it ends.

Q. When the divorce ends?

A. Yes, sir.

Q. Why is it tied to the divorce?

A. Because my business partner realized what was involved in this and he knew I didn't have the money to do it, and that's what we're doing.

Q. So your business partner funded you [$]14[,000] to $15,000 a month to litigate with your wife?

A. No, sir. He didn't fund me. We made an agreement to it.

Q. Okay. So you made an agreement that you received [$]14[,000] to $15,000 a month to do what?

A. We made an agreement that I would receive half of the income from the firm.

Q. Until when?

A. Until my divorce is done because of the cost associated with this.

The other owner of the business did not testify. No documents establishing the above financial arrangement were introduced.

Also, Husband's expert who appraised the business stated that part of the process of preparing the appraisal included a "[s]ite visit and interview with [Husband] performed January 22, 2020, as well as various follow[-]up phone conversations." The report makes no mention that Husband's compensation would end when the divorce suit concluded. With respect to any discussion on the question of Husband's disability, the expert testified as follows:

Q. You're aware, for example, that [Husband] is currently on [S]ocial [S]ecurity [D]isability?

A. I am aware of that, yes.

Q. And so do you think that affects his participation [in] business if he's totally disabled and unable to work?

A. I'm not sure. We haven't spoken in detail about that.

Q. So, again, if he was to continue to draw money and he's totally disabled, his contribution would seem fairly limited in that capacity relying more on his partner's management and activity; would that be true?

A. I don't know.

In a bench trial, the trial court is the sole judge of the credibility of the witnesses. *See Smith v. Smith*, No. 02-20-00370-CV, 2022 WL 1682427, at *14 (Tex. App.—Fort Worth May 26, 2022, no pet.) (mem. op.). "A factfinder 'may disbelieve an interested witness even if uncontradicted.'" *Berry v. New Gainesville Livestock Auction, LLC*, No. 02-19-00476-CV, 2022 WL 123214, at *6 (Tex. App.—Fort Worth Jan. 13, 2022, no pet.) (mem. op.) (quoting *McGuffin v. Terrell*, 732 S.W.2d 425, 428 (Tex. App.—Fort Worth 1987, no writ)).

Husband asked the trial court to accept his testimony that the other owner of the investment firm allowed him to draw up to $16,000 from the business each month to help him through the divorce. Husband initially testified that he could not work but then testified that he and his partner were doing the work of the firm. And a fact that seems so central to the valuation of Husband's interest in the firm—that his

income from it would cease when the divorce was over—was apparently not shared with the expert appraising the business. These facts left it up to the trial court to determine the credibility of Husband's claim that his income stream from his business or as an investment advisor would end with the divorce. The trial court did not view Husband's claim as credible. It is not within our province to second-guess that decision.

We overrule subsection G of Husband's second issue.

**8. We conclude that there is no cumulative error in the trial court's rulings that renders the division of the estate of the parties manifestly unjust.**

In subsection H of Husband's second issue, Husband contends that "even if this court concludes that the individual errors alone do not necessitate reversal, the trial court's cumulative errors have skewed the net value awarded to each party so drastically that the trial court's division of property was a clear abuse of discretion." We have overruled most of Husband's contentions of error. We will, however, make some adjustments to the values found by the trial court to address some of Husband's contentions.

To illustrate the division of the estate of the parties, we reproduce the chart contained in Husband's reply brief and modify it using italics to reflect the changes that result from our holdings in the prior portions of this opinion.[11]

| NO. | ASSETS | VALUE | HUSBAND | WIFE |
|---|---|---|---|---|
| [1] | Prosperity XXXX | $243.20 | | $243.20 |
| 2 | Bank of America XXXX | $1,925.34 | | $1,925.34 |
| 3 | Bank of America XXXX | $2,718.19 | | $2,718.19 |
| 4 | Prosperity XXXX | $12,800.00 | $6,400.00 | $6,400.00 |
| 5 | Legacy Bank XXXX | | | |
| **6** | **Merrill Edge Bank XXXX** | **$25,187.00** | | **$25,187.00**[12] |
| 7 | Teachers Retirement System XXX | $109,267.00 | $27,316.75 | $81,950.25 |
| 8 | American United Life Insurance XXX | $19,463.96 | | $19,463.96 |
| 9 | Great American Insurance Group No. XXXX | $7,437.23 | | $7,437.23 |
| 10 | Orion Portfolio Solutions (403B) XXXX | $136,156.95 | | $136,156.95 |
| 11 | John Hancock Life | $0.00 | x | |
| 12 | TD Ameritrade XXX | $62,289.70 | $21,552.24 | $40,737.46 |
| 13 | WWE Stock | $112.00 | $112.00 | |
| 14 | 2014 Lexus | $15,000.00 | | $15,000.00 |
| 15 | 2015 Lexus | $21,000.00 | $21,000.00 | |
| 16 | 2013 Genuine Buddy Scooter | $1,575.00 | | $1,575.00 |
| 17 | American Airlines XXXX | Minimal | | x |
| 18 | American Airlines XXXX | Minimal | x | |

[11]Wife also provided a chart in her brief. Husband's reply brief points to errors contained in that chart. Because Husband is the one challenging the trial court's rulings, we utilize the numbers contained in his chart.

[12]We agree with Husband that the Merrill Edge account should be an asset attributable to Wife because she had obtained the funds in the account and had used them during the divorce.

| NO. | | VALUE | HUSBAND | WIFE |
|---|---|---|---|---|
| 19 | **Helix Financial Group, LLP** | *$82,000.00* | *$82,000.00*[13] | |
| 20 | Mineral Interest in 2010 Camelot Drive | Minimal | | x |
| 21 | Proceeds from Sale of XXX | $250,000.00 | $55,000.00 | $195,000.00 |
| 22 | Proceeds arising out of H's lawsuit with Uber which would be reimbursement for medical bills or lost earnings | | x | |
| 23 | Prosperity Safety Deposit Box | | x | |
| | **TOTAL ASSETS** | *$747,175.57* | *$213,380.99* | *$533,794.58* |
| | **Percentage Awarded** | | *28.56%* | *71.44%* |

| NO. | LIABILITIES | VALUE | HUSBAND | WIFE |
|---|---|---|---|---|
| 1 | Bank of America XXXX | $167.36 | | $167.36 |
| 2 | Chase XXXX | $3.98 | | $3.98 |
| 3 | Capital One Spark XXXX | | x | |
| 4 | American Express XXXX | | x | |
| 5 | American Express XXXX | | x | |
| 6 | Citibank XXXX | | x | |
| 7 | Capital One XXXX | | x | |
| 8 | Capital One XXXX | | x | |
| 9 | Capital One XXXX | | x | |
| 10 | Capital One XXXX | | x | |
| 11 | Capital One XXXX | | x | |
| 12 | Capital One XXXX | | x | |
| 13 | **Husband's Medical Liabilities** | **$56,228.68** | **$56,228.68**[14] | |
| 14 | W's debts incurred after June 1, 2018 | | | x |
| 15 | H's debts incurred after June 1, 2018 | | x | |
| 16 | Taxes Due and owing on W's earnings | | | x |

---

[13]Husband's chart shows his interest in Helix as $37,000, but we use $82,000, which is the amount found by the trial court and which is in the range of values offered by the valuation experts.

[14]As reflected in Husband's chart, we include the undisputed value of his medical debt in his column.

| 17 | Taxes Due and owing on H's earnings | ~~$56,087.00~~ | ~~$56,087.00~~[15] | |
|----|----|----|----|----|
| | **TOTAL LIABILITIES** | **$56,400.02** | **$56,228.68** | **$171.34** |
| | **Percentage Awarded** | | **99.70%** | **0.30%** |

**Total Assets less Total Liabilities**   $690,775.55   $157,152.31   $533,623.24

**Final division percentage**   22.75%   77.25%

With respect to the Merrill Edge account, its value represents approximately three percent of the estate. Assuming that error exists, the effect of the Merrill Edge error is *de minimis*. *See Grossnickle*, 935 S.W.2d at 851 (holding that a three-percent error did not warrant reversal and remand for new division). With respect to the Helix valuation, the trial court relied on a value within the range of values in the experts' opinions. With respect to the medical debt, there was no dispute as to its value, and the trial court stated that it had considered that debt in making the property division.

Next, we will not re-chronicle the parties' litanies of the other's claimed misdeeds. But as we have noted, the trial court justified its unequal division on a number of factors, including (1) Husband's higher earning potential, (2) Husband's expenditure of community assets for attorney's fees in his efforts to attack the "Shady

---

[15]Unlike Husband's chart, we do not make an adjustment for taxes owed because (1) the trial court assigned to each spouse the liability for taxes owed on his or her earnings, (2) Husband does not explain how we can count the taxes that the IRS claims that he owes without any consideration of the taxes that Wife allegedly owes, (3) the trial court was not obligated to calculate the amount of taxes due, and (4) the trial court noted that it was the IRS's decision as to which party would be liable for the taxes.

House" transaction, and (3) the higher diversions of cash made by Husband during the course of the divorce. Again, most of the attacks that Husband has made against the trial court's exercise of its discretion have failed.

A prior opinion of this court concluded that the award of 72.9% of the community estate's assets was equitable and considered the following factors, which are analogous to those relied on by the trial court in this case:

> [T]he trial court took several considerations into account. A key factor was [husband's] abusive and violent nature, which ultimately contributed to the divorce. In addition, [husband] earned a steady income and retirement benefits; [wife] never worked outside the home. [Husband] also received a large portion of the personal property acquired during the marriage. Further, the trial court found that [husband had] committed waste of the community estate by acquiring property, incurring debt, and escalating attorneys' fees after the couple's separation.

*Faram v. Gervitz–Faram*, 895 S.W.2d 839, 844 (Tex. App.—Fort Worth 1995, no writ).

Due to Husband's failure to prevail on most of his challenges to discrete portions of the trial court's decisional process and due to authority upholding a similarly disproportionate division of the estate of the parties based on factors not dissimilar to those used in this case, we cannot conclude that the trial court's division of the estate of the parties was not "just and right."

We overrule subsection H of Husband's second issue and overrule his second issue in total.

### C. The trial court did not abuse its discretion by denying Husband's motion for new trial.

In his third issue, Husband challenges the denial of his motion for new trial. He contended in the motion that there was newly discovered evidence of an investigation by the school district that employed Wife as a teacher. Husband made the following contention regarding why evidence of the investigation warranted a new trial:

> As discussed above, the trial court rendered a division that was extremely favorable to Wife. The new evidence, however, showed that for many years, Wife had been hiding community funds from Husband, had been found to have misappropriated funds at school, had withheld evidence of her misdeeds, and had blatantly misrepresented such activities at trial. In addition, these misdeeds align with Wife's use of gift cards and cash[-]back transactions to hide money from Husband, which were not at all ordinary when viewing the totality of the circumstances in light of the new evidence. Given that the court is responsible for dividing the community estate in a manner that is "just and right," the new evidence of Wife's fraudulent activity was material and probably would produce a different result at a new trial.

Husband acknowledges that he knew of the school district's investigation before trial. What he claims that he did not know about until after trial was that the school district's investigation had concluded that Wife had mishandled school funds and that the school district had placed her on probation. He claimed that he had learned of the documents related to the investigation when an investigative reporter gave him copies of documents from the school district. Husband also contends that his document requests to Wife were broad enough to cover the school-district documents, but she did not produce them. Husband, however, does not contend that

62

he sought documents regarding the investigation from the school district itself before trial.

The fact of an investigation by the school district was known to Husband before trial. When the trial court asked Husband's lawyer, who was representing him on the new-trial matter, why Husband's prior counsel could not have obtained the documents, new counsel referenced no effort to obtain the documents from the school district before trial and only speculated about whether prior counsel might not have been able to obtain the documents. This speculation is not sufficient to show that if pursued with diligence, the documents would not have been obtained. The trial court did not abuse its discretion by denying the motion for new trial.

"We review a trial court's refusal to grant a motion for new trial for abuse of discretion." *Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 926 (Tex. 2009). A party may predicate a motion for new trial on the existence of newly discovered evidence, but the party must introduce evidence to support the motion's contentions. Tex. R. Civ. P. 324(b)(1) ("A point in a motion for new trial is a prerequisite to the following complaints on appeal: (1) A complaint on which evidence must be heard such as one of . . . newly discovered evidence . . . ."). A party seeking a new trial based on newly discovered evidence

> must demonstrate to the trial court that (1) the evidence has come to its knowledge since the trial, (2) its failure to discover the evidence sooner was not due to lack of diligence, (3) the evidence is not cumulative, and (4) the evidence is so material [that] it would probably produce a different result if a new trial were granted.

63

*Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). On the question of diligence in obtaining the evidence that the movant claims is newly discovered, "[t]he due[-]diligence requirement has not been met if the same diligence used to obtain the evidence after trial would have had the same result if exercised before trial." *Neyland*, 324 S.W.3d at 652. "Every reasonable presumption will be made on review in favor of orders of the trial court refusing new trials." *Jackson v. Van Winkle*, 660 S.W.2d 807, 809–10 (Tex. 1983), *overruled on other grounds by Moritz v. Preiss*, 121 S.W.3d 715, 721 (Tex. 2003); *Hinkle v. Hinkle*, 223 S.W.3d 773, 783 (Tex. App.—Dallas 2007, no pet.).

To reemphasize a point, the evidence is not that Husband did not know of the investigation by the school district but that he did not know of the documents concluding the investigation. The trial court pointedly asked Husband's new trial counsel if Husband's prior counsel could not have obtained the documents during the following exchange:

> THE COURT: Okay. Now, let me ask you this. Two things that are important to me.
>
> One is: Was there anything that prevented [Husband's trial counsel] --
>
> Trial counsel, right?
>
> [Husband's post-trial counsel]: Yes.
>
> [Wife's counsel]: Yes.
>
> THE COURT: Whoever trial counsel may have been.

-- to have gone -- to have known an investigation had occurred and to have gone to [the school district] and gotten a copy of this.

[Husband's post-trial counsel]: So two things: They knew an investigation was happening through the deposition testimony that [Husband] just testified about.

But two, even when I requested these records, you have to be very specific because I gave them records that [Husband] had received through the reporter. I gave them those records, and I said, "I wanted these," and they didn't even present all of those to me. So you have to be very specific, apparently in that request to them. *If they didn't know that these records even existed,* **I don't know** *if they could've gotten them.* [Emphasis added.]

*See generally Anderson v. Safeway Tom Thumb*, No. 02-18-00113-CV, 2019 WL 2223582, at *11–12 (Tex. App.—Fort Worth May 23, 2019, pet. denied) (per curiam) (mem. op.) (stating that trial court is free to depend on counsel's unobjected-to statements as evidence).

This statement—in which counsel expresses his uncertainty regarding whether the documents could have been obtained before the trial without providing the school district with copies of the documents that were wanted—morphs into certainty when Husband's brief claims that the documents could not have been obtained before trial without being able to describe the documents sought with extreme specificity, such as knowing their titles:

Moreover, Husband satisfies the due[-]diligence requirement because the actions he took after the trial to obtain the authenticated records *would not have had the same result if exercised before trial.* As explained at the hearing, the record requests required extreme specificity when seeking documents. Husband *was only able* to obtain the records from the school district because he already had copies of them[] and thus knew precisely

65

which documents to request. [Emphasis added.] [Citations and footnotes omitted.]

The testimony cited above does not support Husband's argument. Husband does not argue that reasonable diligence did not require him to seek the documents from the school district (especially when he claims that he knew that Wife had not been forthcoming in discovery), and he did not establish that requesting the documents from the school district before trial would not have caused their production. He never made that effort, and his counsel could not answer the specific question regarding whether efforts before trial might have caused the school district to produce them. Accordingly, the trial court did not abuse its discretion by denying Husband's motion for new trial.

We overrule Husband's third issue.

**D.     There is insufficient evidence to support the trial court's award of conditional attorney's fees to Wife.**

In his fourth issue, Husband challenges the proof supporting the trial court's award of conditional appellate attorney's fees to Wife. We agree that the proof was conclusory and does not support the award. We therefore remand this matter for a new trial solely on the issue of appellate attorney's fees.

The decree provides "that if an appeal is filed, [Wife] is awarded $40,000.00 in attorney's fees should . . . she prevail." The decree awarded Wife an additional $20,000 in fees "in the event an appeal is filed to the Texas Supreme Court." The trial court entered a finding that provides "that Wife should be awarded reasonable and

necessary attorney's fees of $40,000.00 if Husband appeals to the Court of Appeals and his appeal is unsuccessful, and $20,000.00 additional reasonable and necessary attorney's fees if Husband appeals to the Texas Supreme Court and the appeal is unsuccessful."

The sole extent of Wife's counsel's testimony on appellate fees follows:

[Wife's counsel]: We have my client, Your Honor, I'd like to at least put on some evidence of what I believe reasonable costs would be for appeal.

It would be my testimony that through the appeal of the Court of Appeals, which I think is going to happen, $20,000 would be a fair and reasonable fee for her. If he has an unsuccessful petition for review, I think my client would incur cost of $15,000.

If he has unsuccessful brief on the merits before the Supreme Court, there would be an additional $15,000. [In] terms of oral arguments before the Supreme Court, if they have to travel there and present those, I believe a reasonable fee would be $7,500 minimum for that oral argument.

Those are all conditioned upon unsuccessful events, Your Honor.

THE COURT: Okay. Anything further?

[Husband's post-trial counsel]: Briefly.

What's the expected rate, billable rate?

[Wife's counsel]: I believe . . . [one partner] charges [$]495 an hour, Your Honor. I was basing that on my experience of $400 an hour.

[Husband's post-trial counsel]: And is the petition for review, is that if the [c]ourt requests a response to it?

[Wife's counsel]: No, if there's . . . responses requested, we have to file some response to, that's [$]15,000.

[Husband's post-trial counsel]: Okay.

[Wife's counsel]: If they kick it out summarily, there would not be any cost.

[Husband's post-trial counsel]: Nothing further, Judge.

The Texas Supreme Court recently dealt with the proof necessary to prove conditional appellate attorney's fees. *See Yowell v. Granite Operating Co.*, 620 S.W.3d 335, 354 (Tex. 2020). After noting its recent elaboration of the proof necessary to establish trial fees, the court delved into the question of how that ruling impacted the proof of appellate fees. *Id.* at 354–55. *Yowell* highlighted the practical distinction between the proof of trial fees—where the service has already been rendered—and appellate fees where the details of who will render the services and what those services will be remain hypothetical. *Id.* at 355. Though what fees will be incurred on appeal are hypothetical, the supreme court nevertheless held that "uncertainty does not excuse a party seeking to recover contingent appellate fees from the need to provide opinion testimony about the services it reasonably believes will be necessary to defend the appeal and a reasonable hourly rate for those services." *Id.*

In *Wells Fargo Bank, N.A. v. Rodriguez*, we recently applied *Yowell*'s standard that the proof of appellate fees must include information on what services will be necessary to defend the appeal. No. 02-21-00155-CV, 2022 WL 803839, at *5 (Tex. App.—Fort Worth Mar. 17, 2022, no pet.) (mem. op.). We held that the standard was not met by an attorney's bare opinion that "an additional $5,000.00 is reasonable and

68

necessary in the event of an appeal to the Court of Appeals[] and that the sum of an additional $5,000.00 is reasonable and necessary in the event a petition for review is sought in the Supreme Court of Texas." *Id.*

Wife's counsel's opinion is similarly bare; it is not adequate to support the trial court's award of conditional appellate fees. We conclude that because Wife's counsel's testimony lacks the proper detail of the services to be rendered, the determination of appellate fees should be remanded to the trial court. *See Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 506 (Tex. 2019) (remanding to trial court when "the record does not provide the requisite details to support a fee award").

Husband also contends that "[b]ecause [his] appellate fees were properly proved up for prosecuting this appeal, should [he] prevail, the [c]ourt should remand the issue of appellate fees for prosecuting this appeal so that the trial court can award those to Husband." Upon remand, the trial court may consider whether anything in our disposition of this appeal warrants a recalibration of the appellate fee award.

We sustain Husband's fourth issue.

## IV. Conclusion

Having sustained Husband's fourth issue, we reverse the trial court's corrected final decree of divorce to the extent that it awards appellate attorney's fees and remand this case to the trial court for a new trial solely to determine appropriate

appellate attorney's fees.   Having overruled Husband's other issues, we affirm the remainder of the trial court's corrected final decree of divorce.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  January 5, 2023